Filed 3/26/21  In re D.V. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| In re D. V., a Person Coming Under the Juvenile Court Law. | C091368 |
| BUTTE COUNTY DEPARTMENT OF EMPLOYMENT AND SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>N. S.,<br><br>Defendant and Appellant. | (Super. Ct. No. 19DP00120) |

N. S., the minor's former foster parent, appeals from the juvenile court's order denying her petition for de facto parent status.  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

The minor was born in May 2019 and placed with N. S. as a foster child.  While the minor was in the hospital, N. S. visited the nursery to hold and interact with her.  The

minor was released to go home with N. S. and stayed at N. S.'s home for approximately five months. The minor was then placed with a prospective adoptive family.

N. S. filed a statement with the court protesting the minor's removal. In the statement, N. S. explained that removing the minor was harmful both to the minor and to N. S.'s older daughter, because the three of them had been a family for five months at that point. N. S. explained the girls got along well and that N. S. was qualified to adopt the minor. N. S. discussed conversations she had with the Hmong Cultural Center and other Hmong acquaintances to prepare herself to help the minor understand the minor's Hmong heritage. N. S. also detailed her daily activities, including holding and singing to the minor, and playing games with her older daughter and the minor to make the minor laugh. N. S.'s older daughter cried after dropping the minor off with the prospective parents, and N. S. "wanted to cry but . . . couldn't for [the older daughter's] sake."

N. S. then filed a request for prospective adoptive parent designation. In the request, N. S. wrote she had first asked to be designated as the minor's permanent placement when the minor had been released from the hospital. She made the request again at a family meeting the next month. In September 2019, Lynette Dornon, an adoption social worker, interviewed N. S. at home. Dornon expressed concern about N. S.'s ability to help the minor learn about the minor's Hmong heritage and the possibility that the minor would have to compete with N. S.'s older daughter, who had special needs, for attention. N. S. was ultimately told a different family had been chosen.

In November 2019, N. S. filed a request to be designated a de facto parent. N. S. explained the minor had lived with her for approximately five months, she had not attended any of the minor's court hearings, and had not sent any written reports to the court about the minor. She described her daily activities with the minor, including taking the minor for walks outdoors in her baby carrier. She left blank the section on the request asking for any unique information she possessed about the minor.

The juvenile court held a hearing on both of N. S.'s requests in January 2020. Social worker Jose Medrano-Santos and N. S. testified at the hearing. Medrano-Santos explained he was responsible for determining the minor's placement, while Dornon was responsible for determining the adoptable home. After N. S. took the minor home from the hospital, Medrano-Santos observed them interacting on three separate occasions when he performed home visits. During each visit, he saw the minor making eye contact with and cooing at N. S. He believed N. S. responded appropriately to the minor's cues and did not have any concerns the two were not bonding well. He did not believe the minor was bonded to N. S.'s older daughter. On one occasion, he saw N. S.'s older daughter acting "a little hyperactive," but N. S. asked her to calm down, which Medrano-Santos thought was appropriate. He did not have any concerns about the rate of the minor's development in N. S.'s care. He testified N. S. had provided him various information about the minor, including that she did not like riding in a car seat or being placed on the floor, but enjoyed being carried in a Moby wrap.

In December 2019, Medrano-Santos and N. S. participated in a family meeting where they discussed how to facilitate visits between N. S. and the minor. They determined N. S. could visit the minor at an adoption agency office in the Bay Area, but N. S. did not want to discuss the issue and said, "Well, that can be settled in court." N. S. did not request any visits after this meeting and no visits had taken place by the time of the hearing. Medrano-Santos assessed the minor after her placement with the prospective adoptive family and reported she was doing "really well."

N. S. testified the minor was in her care from May to October 2019. She was aware when court hearings regarding the minor were occurring, but did not attend any because she did not know she "was supposed to be at any of them." She decided she wanted to be the permanent placement for the minor when the minor was still in the hospital. She testified that when she first brought the minor home, the minor was not

eating well, so she carried the minor strapped to her body so the minor could feel her heat. She also sang to the minor, rocked her in a rocking chair, and talked to her.

After she was informed she would not be the permanent placement for the minor, N. S. hosted visitations for the prospective adoptive family. If N. S. were a de facto parent, she would provide information about the minor's development and medical history. On cross-examination, she acknowledged she had already provided all the information she had about the minor to the county. She agreed she did not have any new information about the minor's developmental needs. She explained the only unique information she had was about the minor's emotional and psychological status, but admitted that information had likely changed by the time of the hearing. As of the hearing date, N. S. had "no information to provide to the Court on how [the minor's] doing presently, or whether or not she's developing normally."

The juvenile court denied the request for de facto parent status, saying: "All right, the Court is going to rule that she does not qualify as a defacto parent. She might have qualified back in September, but she clearly doesn't qualify now. [¶] . . . . [¶] Has no independent information about the child's feeding schedule, the child['s] sleeping schedule, what the child's current needs are. Unfortunately, a couple of those things happened when I was on vacation, I guess her asking for -- and a couple of the documents being filed. But I have looked back, and the record I think is clear, I just don't see that she can offer anything to qualify as a defacto parent, and the Court is going to deny that request." The court later issued a short written order finding "as of the time and date of this hearing, the former caregiver does not possess unique information with respect to the child; that the child has no current special needs with respect to which the former caregiver would be able to provide input to the court or to the agency; that, at this time, the former caregiver does not meet the requirements of being designated as a de facto parent."

4

DISCUSSION

N. S. contends the juvenile court abused its discretion when it denied her petition because: (1) N. S. met the criteria for de facto parent status, and (2) the court improperly used the fact N. S. was no longer the minor's caretaker as a factor in the analysis. We disagree.

" 'De facto parent' means a person who has been found by the court to have assumed, on a day-to-day basis, the role of parent, fulfilling both the child's physical and psychological needs for care and affection, and who has assumed that role for a substantial period." (Cal. Rules of Court, rule 5.502(10).) If the juvenile court finds that a person meets this standard, the court may grant him or her standing to participate as a party to the proceeding, with the rights to be present at any hearing at which the status of the dependent child is at issue, to be represented by retained or appointed counsel, and to present evidence. (Cal. Rules of Court, rule 5.534(a).)

"Whether a person falls within the definition of a 'de facto parent' depends strongly on the particular individual seeking such status and the unique circumstances of the case. However, the courts have identified several factors relevant to the decision. Those considerations include whether (1) the child is 'psychologically bonded' to the adult; (2) the adult has assumed the role of a parent on a day-to[-]day basis for a substantial period of time; (3) the adult possesses information about the child unique from the other participants in the process; (4) the adult has regularly attended juvenile court hearings; and (5) a future proceeding may result in an order permanently foreclosing any future contact with the adult. [Citations.] . . . Because a court can only benefit from having all relevant information, a court should liberally grant de facto parent status." (*In re Patricia L.* (1992) 9 Cal.App.4th 61, 66-67, fns. omitted.)

The juvenile court makes its findings as to de facto parenthood by a preponderance of the evidence, and we review its findings for abuse of discretion. (*In re Leticia S.* (2001) 92 Cal.App.4th 378, 381.) We will not find an abuse of discretion

5

unless the court "has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination." (*Ibid.*)

The juvenile court's decision was based on evidence that N. S. did not meet the third factor in the de facto parent analysis: she did not possess unique information about the minor. This finding was supported by N. S.'s testimony acknowledging she had already provided all the information she had about the minor to adoption services. N. S. identified the minor's "emotional" and "psychological" status as unique information she had about the minor, but did not point to any specific details or facts she knew. And, by the time of the hearing, the minor was approximately eight months old and had been out of N. S.'s care for three months. N. S. agreed that three months was a significant period of time for an eight-month-old child, and that any information she did have would have changed in that time. Assuming N. S. originally had unique information to provide to the juvenile court, the court concluded the information was stale and would not be relevant or helpful. Thus, one of the purposes of de facto parent status -- providing the court with " 'critical information' " resulting from the de facto parent's " 'close and continuing relationship with [the] child' " -- was not met. (*In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1513, fn. 19.)

The other four *Patricia L.* factors were evenly split: N. S. and the minor were psychologically bonded and N. S. did assume the role of parent for a substantial period of time. But N. S. had not attended any juvenile court hearings and would not be precluded from contacting the minor in the future. Given this split, it was reasonable for the court to treat the unique information factor as the primary factor informing the decision.

N. S. argues the juvenile court inappropriately denied her request simply because she was not the minor's current caretaker, pointing to the court's comment that she "might have qualified [as a de facto parent] back in September, but she clearly doesn't qualify now." But this argument relies on a misreading of the court's statement. In context, the statement meant only that N. S.'s knowledge of the minor, while current in

6

September, had become dated by the time of the hearing in January.  And, because N. S. had chosen not to visit the minor in the interim, she had no way of independently updating any information she had about the minor.  The court was not denying the request because of N. S.'s status as a former caretaker, but rather commenting on N. S.'s ability to provide information that could assist the court.  Because one of the primary purposes of de facto parent status is the provision of such information, we see no error in the court's decision to deny N. S. de facto parent status.

DISPOSITION

The order denying de facto parent status is affirmed.


/s/
Robie, J.

We concur:



/s/
Blease, Acting P. J.



/s/
Murray, J.

7